## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHERYL STEELE**, <br><br> Plaintiff, <br><br> v. <br><br> **RUSSELL VOUGHT**, Acting Director, <br> Consumer Financial Protection Bureau,[1] <br><br> Defendant. | Case No. 24-cv-763 (CRC) |

## <u>MEMORANDUM OPINION</u>

The Consumer Financial Protection Bureau ("CFPB" or "the Agency") hired Cheryl Steele, a Black woman, as an Examiner in its Northeast region.  To determine her base salary, the CFPB scored and weighted her prior work experience based on whether it was directly related to the Examiner position.  The Agency's compensation team concluded that while Steele had considerable work experience overall, she lacked experience performing duties similar to those required of an Examiner.  Accordingly, the Agency offered her an annual base salary of $64,823.  After the Agency denied Steele's request for a higher salary, she accepted the job offer.

Years later, Steele filed this lawsuit, alleging that the Agency engaged in both race and sex discrimination by offering her a lower base salary than several white and/or male Examiners, in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act of 1963 ("Equal Pay Act").  The Agency now moves for summary judgment, claiming that there is no genuine dispute that her salary was based on her prior work experience, not her race or sex. For the reasons discussed below, the Court will grant the Agency's motion.

---

[1] By substitution pursuant to Fed. R. Civ. P. 25.

## I.    Background

### A.  Steele's Initial Salary Determination

Steele applied to be an Examiner at the CFPB in 2014.  See Declaration of Lindsay Bacon ("Bacon Decl."), Ex. 1 at 5.  As an Examiner, she would assess whether financial institutions adhered to consumer protection laws and ensure that they maintained adequate compliance programs.  See id. at 3.  A few months after Steele submitted her application, the Agency selected her for a CN-40 Examiner position in the Northeast region.[2]  See Bacon Decl. ¶ 2; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 5 at 28.  She was offered an annual base salary of $64,823.[3]  Pl.'s Opp'n, Ex. 5 at 28.

The Agency set Steele's base salary using its standard "pay setting tool" for external hires.  Declaration of Cyrus Mostaghim ("Mostaghim Decl."), Ex. 1 at 394; id., Ex. 3 at 274.  The pay setting tool calculated a candidate's base salary by quantifying three factors: Directly Related Experience, Overall Professional Experience, and Candidate Skill Set.  See Mostaghim Decl. ¶ 5; id., Ex. 2 at 264–65.  Directly Related Experience referred to the "[n]umber of years of experience at a level equivalent to the position performing the duties and responsibilities described in the position description."  Id., Ex. 3 at 274.  Overall Professional Experience included the "[n]umber of years of overall experience working in an industry or content area comparable to the position to which the candidate has applied."  Id.  Any Directly Related Experience also counted as Overall Professional Experience.  Mostaghim Decl. ¶ 22.  Candidate

---

[2] "CN-40" is one of the "CN" pay bands that the CFPB used to set employee salaries.  In 2015, a salary within the CN-40 pay band was equivalent to a salary between the GS-8 and GS-10 levels in other parts of the federal government.  See Declaration of Cyrus Mostaghim, Ex. 4.

[3] Steele's base salary was subject to a locality adjustment.  See Sohn Decl., Ex. 6.

Skill Set measured "[t]he skill set of the candidate and the degree to which those skills can be transferred to the level identified in the position description." Id., Ex. 3 at 274.

Each candidate received one of four "quartile scores" for each factor based on his or her level of experience or skill set. For example, a candidate with fewer than two years of Directly Related Experience fell within Quartile 1 for that factor, while a candidate with more than eight years of Directly Related Experience fell within Quartile 4. Id. A candidate then received an "overall quartile score" based on a weighted average of the quartile scores for each factor.[4] Id. at 275. The overall quartile score determined where a candidate's salary fell within a CN pay band.[5] Id., Ex. 2 at 264.

When the CFPB selected Steele to be an Examiner, a staffing consultant for the Agency's Office of Human Capital provisionally completed portions of her pay-setting form. See Bacon Decl. ¶ 2; Mostaghim Decl. ¶ 6. The consultant's "impression" was that Steele should be placed in Quartile 2 for Directly Related Experience, Quartile 3 for Professional Experience, and Quartile 3 for Candidate Skill Set, yielding an overall quartile score of 2.6. Bacon Decl. ¶ 3. The consultant sent the pay-setting form, along with Steele's resume and the position description, to the Agency's compensation team. Id. ¶ 2; id., Ex. 1. Neither the consultant nor the compensation team knew Steele's salary from her then-current employer. Bacon Decl. ¶ 4; Mostaghim Decl. ¶ 28.

---

[4] Directly Related Experience accounted for 40 percent of a candidate's overall quartile score, Overall Professional Experience accounted for 30 percent, and Candidate Skill Set accounted for 30 percent. See Mostaghim Decl., Ex. 3 at 274.

[5] Each CN pay band was divided into four quartiles. See Mostaghim Decl., Ex. 4. For example, a candidate with an overall quartile score of 2.5 fell within the midpoint of Quartile 2. See Mostaghim Decl. ¶ 11.

The CFPB's compensation team then used Steele's resume and the position description to independently calculate her overall quartile score. Mostaghim Decl. ¶ 20. The team first credited her with 1.25 years of Directly Related Experience (i.e., Quartile 1) based on her prior employment as a "Consumer and Business Banker." Id. ¶ 21. She was then credited with 10.25 years of Overall Professional Experience (i.e., Quartile 4) based on her experience as both a banker and an economist with the Department of Agriculture ("USDA"). Id. ¶ 22. Finally, she was credited with "high skill levels" for Candidate Skill Set (i.e., Quartile 3). Id. ¶ 23. Steele's overall quartile score was 2.5, placing her base salary at $64,823, the midpoint of Quartile 2 for the CN-40 pay band. Id. ¶ 24; id., Ex. 1 at 394; id., Ex. 4.

The compensation team then compared Steele's base salary to the salaries of two other CN-40 Examiners "who were her closest peers based on experience." Mostaghim Decl. ¶ 29. One Examiner received approximately $2,500 more in base salary because she had "more overall creditable experience" and "more experience related to the examination of financial institutions," while the other received approximately $5,500 less because he had "less overall creditable experience." Id. Accordingly, the compensation team decided to not adjust Steele's base salary. Id. ¶ 30; id. Ex. 1.

After the CFPB extended the job offer to Steele, she wrote back to request a base salary between $76,378 and $84,017. Pl.'s Opp'n, Ex. 5 at 33. She cited her education, her years of experience as an economist, and the skills that qualified her for the position. Id. at 33–36. She also noted that she reached the GS-12 level during her prior employment in the federal government, which was equivalent to the CN-52 pay band. Id.; see Mostaghim Decl., Ex. 4. Steele's request was forwarded to an assistant regional director for the Northeast region. Declaration of Alisa Strittmatter ("Strittmatter Decl.") ¶ 4; id., Ex. 1. The assistant regional

director had previously compared Steele's base salary to other CN-40 Examiners in the Northeast region. Bacon Decl. ¶ 8. At that time, only one of the thirteen Examiners—who was also a Black woman—received a higher base salary than what Steele was offered. Id.; Declaration of Derick Sohn ("Sohn Decl."), Ex. 9 at 746. Because Steele's base salary was "about as high as any other grade 40," the assistant regional director elected to "hold firm" on the Agency's offer. Strittmatter Decl. ¶ 4; id., Ex. 1. Steele then accepted the offer at the original base salary. Sohn Decl., Ex. 3 at 88.

B. Salary Determinations for Other CFPB Examiners

Around the time when the CFPB hired Steele, it also hired several other candidates for the CN-40 Examiner position. Three of those hires are relevant in this case: Ostap Dumansky, Edward Defeo, and Robert Jackson.

1. *Ostap Dumansky*

In 2015, the CFPB hired Ostap Dumansky, a white man, as a CN-40 Examiner in the Northeast region. Mostaghim Decl. ¶ 33; Sohn Decl., Ex. 15 at 9. The Agency used its pay-setting tool to determine his initial base salary. Mostaghim Decl. ¶ 34; id., Ex. 7. He was credited with between four and eight years of Directly Related Experience (i.e., Quartile 3) because of his prior employment as both a loan originator at a mortgage company and an underwriter for an insurance company. Mostaghim Decl. ¶ 35. He was also credited with over eight years of Overall Professional Experience (i.e., Quartile 4) and "high skill levels" for Candidate Skill Set (i.e., Quartile 3). Id. ¶¶ 36–37. His overall quartile score was 3.3—within the third quartile for the CN-40 pay band—so the compensation team initially set his base salary at $73,715. Id. ¶ 38; id., Ex. 4. After comparing Dumansky's salary to the salaries of his "closest peers," the compensation team increased his base salary to $74,667. Mostaghim Decl.

¶¶ 40–41; <u>id.</u>, Ex. 7.  Dumansky requested a higher salary, but the assistant regional director for the Northeast region—who also received Steele's request for a pay increase—declined to change it.  <u>See</u> Declaration of Shannon Sutorus ("Sutorus Decl."), Ex. 1.

### 2.  Edward Defeo

The CFPB also hired Edward Defeo, another white man, as a CN-40 Examiner in the Northeast region.  Sohn Decl., Ex. 15 at 9; Mostaghim Decl. ¶ 44.  When using the pay-setting tool to set Defeo's initial salary, the Agency credited him with more than eight years of Directly Related Experience (i.e., Quartile 4) due his prior employment as "an executive and loan originator at various mortgage companies," more than eight years of Overall Professional Experience (i.e., Quartile 4), and "high skill levels" for Candidate Skill Set (i.e., Quartile 3).  Mostaghim Decl. ¶¶ 46–48; <u>id.</u>, Ex. 9.  His overall quartile score was 3.7—also within the third quartile of the CN-40 pay band—so the compensation team initially set his base salary as $78,161.  Mostaghim Decl. ¶ 49.  The compensation team then decreased his base salary to $77,685 after comparing it to his "closest peers."  <u>Id.</u> ¶ 52; <u>id.</u> Ex. 9.

### 3.  Robert Jackson

The CFPB selected Robert Jackson, a Black man, to be a CN-40 Examiner in the Midwest region.  Sohn Decl., Ex. 15 at 9; Mostaghim Decl. ¶ 55.  In 2014, the compensation team set his initial base salary at $59,292 because his Directly Related Experience, Overall Professional Experience, and Candidate Skill Set all fell within Quartile 2.  Mostaghim Decl. ¶ 56; <u>id.</u>, Ex. 11.  Like Steele and Dumansky, Jackson asked to negotiate his initial base salary.  Bacon Decl. ¶ 12.  But unlike Steele and Dumansky, Jackson's request was forwarded to an assistant regional director for the Midwest region where he would be working, rather than the Northeast region.  <u>Id.</u> ¶ 13; <u>id.</u>, Ex. 2.  The Midwest assistant regional director supported

Jackson's request, in part because his prior employment as an investigator with the Equal Employment Opportunity Commission ("EEOC") provided him with "relevant examination skills" that were "needed in the Midwest Region." Id., Ex. 2. After considering Jackson's request, the Midwest assistant regional director's comments, and the "critical hiring need that existed in the Midwest region at the time," the compensation team adjusted Jackson's Directly Related Experience to Quartile 3, his Overall Professional Experience to Quartile 4, and his Candidate Skill Set to Quartile 3. Mostaghim Decl. ¶¶ 58–63; id., Ex. 12. His new overall quartile score was 3.3—within the third quartile of the CN-40 pay band—so the compensation team set his initial base salary at $74,668.[6] See Mostaghim Decl. ¶ 62; id., Ex. 12.

    C.  Procedural History

    After exhausting her administrative remedies, Steele filed this lawsuit. See Pl.'s First Amended Compl. ("FAC") ¶¶ 7–9. She alleged that despite her extensive qualifications, the Agency only offered her a base salary within Quartile 2 of the CN-40 pay band, while two white men—Dumansky and Defeo—received base salaries within Quartile 3 for the same position. See id. ¶¶ 18, 21. She also alleged that Jackson, another man, received a "more favorable" base salary after negotiating with the Agency. Id. ¶ 22. Because the CFPB purportedly treated Steele differently than these comparators during the hiring process, she claimed that the Agency violated both Title VII and the Equal Pay Act. The parties engaged in discovery, and the Agency now moves for summary judgment.

---

    [6] It is unclear whether Jackson's revised base salary was $74,142 or $74,668. Compare Mostaghim Decl. ¶ 64 with id., Ex. 12. For purposes of summary judgment, the Court accepts Steele's representation that Jackson's revised base salary was $74,668. See Pl.'s Statement of Genuine Issues ¶ 6.

## II.  Legal Standards

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the Court examines "all relevant evidence presented by the plaintiff and defendant."  Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).  The Court resolves all factual disputes and draws "all justifiable inferences" in favor of the nonmoving party.  Anderson, 477 U.S. at 255; see also Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  The nonmoving party must offer more than mere allegations or denials; instead, it must support its opposition with affidavits, declarations, or other competent evidence providing specific facts that establish a genuine issue for trial.  Fed. R. Civ. P. 56(c); Guillen-Perez v. District of Columbia, 415 F. Supp. 3d 50, 57 (D.D.C. 2019) (Cooper, J.).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.  Analysis

Steele alleges that the Agency engaged in race and sex discrimination by setting her initial salary below that of her white and/or male colleagues.  She brings two claims under Title VII (race and sex discrimination) and one claim under the Equal Pay Act (sex discrimination).

The Agency's response to all three claims is the same:  It determined Steele's initial salary based on her prior work experience, not her race or sex.  Because Steele has not shown that this explanation is pretextual or otherwise subject to reasonable dispute, the Agency is entitled to summary judgment on all three claims.

    A.  <u>Title VII</u>

Steele asserts that the Court cannot grant summary judgment on her Title VII claims because there is a genuine dispute as to whether her "race and sex impacted the [Agency's] determination of [her] initial salary."  Pl.'s Opp'n at 10.

Title VII provides that employers may not "discriminate against any individual with respect to [her] compensation . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  In this case, Steele does not present any direct evidence of discrimination; she instead cites the alleged disparate treatment she received compared to her white and male colleagues.  Her disparate treatment claims are therefore evaluated under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under that framework, Steele must first establish a prima face case of discrimination.  <u>Figueroa v. Pompeo</u>, 923 F.3d 1078, 1086 (D.C. Cir. 2019).  If she does so, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  <u>Id.</u> (quoting <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1114 (D.C. Cir. 2016)).  If the CFPB provides a legitimate basis for its compensation decision, "the 'burden then shifts back' to [Steele], who must prove that, despite the proffered reason, she has been the victim of intentional discrimination."  <u>Id.</u> (quoting <u>Wheeler</u>, 812 F.3d at 1114).

"The D.C. Circuit, however, has instructed that when considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a

plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions."  Musgrove v. Gov't of D.C., 775 F. Supp. 2d 158, 169 (D.D.C. 2011) (citing Brady, 520 F.3d at 494).  Here, the Agency provided a reason for its base salary determinations that did not involve Steele's race or sex:  The other CN-40 Examiners "had more years of relevant experience."  Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 15.  Thus, the McDonnell Douglas framework condenses into a single question:  "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  Brady, 520 F.3d at 494.  Put more succinctly, is the Agency's stated reason pretextual?

To answer this question, the Court considers whether a jury could "infer" race or sex discrimination based on (1) "the plaintiff's prima facie case"; (2) "any evidence the plaintiff presents to attack the employer's proffered explanation for its actions"; and (3) "any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer."  Wheeler, 812 F.3d at 1114 (alteration in original) (quoting Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).  Critically, the Court "does not sit as a 'super-personnel department' that reexamines an employer's business decisions," and it "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  Id. (citations omitted); see also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (noting that when an employer articulates a non-discriminatory reason for its decision, "the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers'" (alterations in original) (citation omitted)).  And ultimately, the "burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Wheeler, 812 F.3d at 1114 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

### 1. Initial Salary Determination

Steele submits that the CFPB's explanation for setting initial base salary at $64,823 was pretextual because the Agency (1) did not adequately account for her experience as an Economist with the USDA; (2) lowered her overall quartile score to Quartile 2 after the Office of Human Capital initially determined that her overall quartile score fell within Quartile 3; (3) offered higher salaries to white men who also applied for a CN-40 Examiner position; and (4) negotiated a higher base salary for a male CN-40 Examiner while declining to negotiate with her. No reasonable jury, however, would reach the same conclusion.

### a. Calculating Steele's Overall Quartile Score

Steele first claims that the Agency discriminated against her by improperly crediting her prior employment as an economist as Overall Professional Experience instead of Directly Related Experience. In her view, a reasonable juror could conclude that this decision, which decreased her overall quartile score and her initial base salary, "stemmed from discrimination." Pl.'s Opp'n at 16.

Under the CFPB's pay-setting guidelines, a candidate's prior employment qualified as Directly Related Experience if it was "at a level equivalent to the position performing the duties and responsibilities described in the position description." Mostaghim Decl., Ex. 3 at 274. The compensation team concluded that Steele's employment as an economist did not qualify as Directly Related Experience because it was "not sufficiently related to the work of an Examiner." Mostaghim Decl. ¶ 22. Instead, it only counted as Overall Professional Experience

because it "was in a 'content area comparable' to the examination of financial institutions for compliance with applicable law." Id.

The job listing for the CN-40 Examiner position sought applicants who had the "[a]bility to conduct or particulate in examinations, investigations, audits or similar reviews of financial institutions . . . to assess their compliance with Federal and/or State laws." Pl.'s Opp'n, Ex. 5 at 287. The job listing also referenced a candidate's "[a]bility to analyze and evaluate the adequacy of institutional oversight of consumer financial products and services by regulated depository financial institutions or non-depository financial services companies." Id. The CN-40 Examiner position description—which the compensation team reviewed when setting Steele's base salary, see Mostaghim Decl. ¶ 19—similarly noted that an Examiner "evaluates the adequacy of compliance management systems and programs at regulated entities, assesses compliance with applicable laws and regulations and potential impact on consumers, and conducts reviews to determine that the regulated entity does not have unfair, deceptive, or abusive acts or practices." Pl.'s Opp'n, Ex. 8 at 1210.

Steele contends that her duties as an economist at the USDA "mirrored" these descriptions of the CN-40 Examiner position. Pl.'s Opp'n at 16. According to her resume, she (1) "[r]eseached, analyzed, and interpreted regulations"; (2) "[i]dentified data components that were necessary to effectively estimate financial commodities income and developed methodologies to ensure future compliance with proper estimation"; and (3) "[a]nalyzed farm sector financial reports to reconcile financial statements." Id., Ex. 5 at 412. Steele claims that in light of this experience, she should have been credited with eight or more years of Directly Related Experience (i.e., Quartile 4), increasing her overall quartile score from 2.5 to 3.7. Pl's Opp'n at 14.

12

However, Steele cannot simply assert that the Agency got it wrong; she must show that its explanation was "a pretext masking prohibited discrimination." Fischbach, 86 F.3d at 1183; see also Hairston v. Vance-Cooks, 773 F.3d 266, 272 (D.C. Cir. 2014) ("Showing pretext . . . requires more than simply criticizing the employer's decisionmaking process."). In other words, her Title VII claim can only survive summary judgment if she raises "a genuine dispute over the employer's *honest belief* in its proffered explanation." Morris v. McCarthy, 825 F.3d 658, 671 (D.C. Cir. 2016) (emphasis added). Steele has not done so. For example, she has not identified any white or male candidates for the CN-40 position whose prior experience as an economist qualified as Directly Related Experience.[7] Nor has she presented any evidence that the Agency is "making up or lying about the underlying facts that formed the predicate" for its decision to set her Directly Related Experience at Quartile 1. Brady, 520 F.3d at 495. While Steele may disagree with the decision, she "offers no evidence to cast doubt on the accuracy or veracity of [the Agency's] account of how it arrived at [her] salary." Johnson v. WMATA, No. 19-cv-3534 (CRC), 2022 WL 4547527, at *5 (D.D.C. Sept. 29, 2022) (granting summary judgment to an employer on an Equal Pay Act claim), aff'd, No. 22-7149, 2023 WL 2442222 (D.C. Cir. Mar. 6, 2023).

To be sure, the Agency's misjudgment about Steele's qualifications could be evidence of pretext if it "made an error too obvious to be unintentional." Fischbach, 86 F.3d at 1183. But

---

[7] Steele contends that when the compensation team set Jackson's base salary, it counted his prior employment as an EEOC investigator as Directly Related Experience "despite the fact that his resume did not support such a finding." Pl.'s Opp'n at 17. Specifically, he was credited for skills "such as accumulating information through interview," even though that skill was "not even listed in the job announcement or position description." Id. (citing Mostaghim Decl. ¶ 59). But as described below, Jackson's salary was based not only on his resume and the position description, but also the Midwest assistant regional director's comments that the "accumulation of information thru [sic] interview processes" was a "relevant examination skill[]." Mostaghim Decl. ¶ 59; Bacon Decl., Ex. 2.

that is not the case here.  Steele even admitted that her duties as an economist did not require her to "ensure a financial institution complied with applicable laws," Sohn Decl., Ex. 3 at 110, which is a "core area[]" of the Examiner position, Pl.'s Opp'n, Ex. 8 at 1210.  The Agency's categorization of her prior experience was therefore "reasonable in light of the evidence," so there is "no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  Brady, 520 F.3d at 495.  Without evidence of a "demonstrably discriminatory motive," the Court is in no position to second-guess the Agency's decision.  Fischbach, 86 F.3d at 1183 (citation omitted).[8]

### b.  "Lowering" Steele's Overall Quartile Score

Steele next asserts that the CFPB discriminated against her by setting her overall quartile score in Quartile 2, even though the Agency's Office of Human Capital purportedly concluded that she fell in Quartile 3.  See FAC ¶ 20; Sohn Decl., Ex. 1 at 3.

To support this claim, Steele cites the pay-setting form that the Agency used to calculate her base salary.  The first page of the form indicates that her overall quartile score was 2.5.  Pl.'s Opp'n, Ex. 4 at 394.  In a box labeled "Final Salary Offer," the form listed her quartile score as "Q2."  Id.  However, the "Justification" section on the second page of form states, "Candidate falls into Q3."  Id. at 395.  Steele asserts that this notation was "not a typo," but actually her

---

[8] The Court also doubts whether the compensation team even *knew* Steele's race when setting her base salary.  See Mostaghim Decl. ¶ 32; Bacon Decl. ¶ 9.  That alone would be dispositive as to her race discrimination claim under Title VII.  See Pollard v. Quest Diagnostics, 610 F. Supp. 2d 1, 21 (D.D.C. 2009) ("It is axiomatic that a defendant cannot be found to have discriminated against a plaintiff on the basis of race where the defendant had no knowledge of the plaintiff's race.").  But the Court need not decide this issue, as even if the compensation team was aware of Steele's race or sex, there is no evidence that the compensation team discriminated against her based on those traits.

"recommended salary." Pl.'s Opp'n at 4. She then claims that the first page of the pay-setting form—including her overall quartile score—was "modified to account for a lower salary." Id.

The Agency submits that the "Q3" statement was a typographical error rather than an actual determination of Steele's overall quartile score. See Def.'s Mot. at 24–25. The Office of Human Capital contractor who initially completed the pay-setting form stated that she did not know why the "Q3" statement appeared on the form, as she "never recommended that Ms. Steele fell into Quartile 3 overall for purposes of determining her hiring salary." Bacon Decl. ¶ 6. A member of the compensation team did not recall "how that inaccuracy was introduced into Ms. Steele's pay-setting form," but believed it was "a typographical error." Mostaghim Decl. ¶ 26 ("It is most likely that the drafter of that sentence intended to state that Ms. Steele fell 'into Q2,' consistent with the crediting determinations that are reflected on the first page of the pay-setting form.").

While Steele may dispute whether the statement "Candidate falls into Q3" was a typo, she can only survive summary judgment if the dispute is *genuine*. See Anderson, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)). The Agency has provided ample evidence that the "Q3" statement on Steele's pay-setting form was unintentional, including sworn declarations by the contractor who prepared the form and a member of the compensation team that set Steele's overall quartile score. See Bacon Decl. ¶ 6; Mostaghim Decl. ¶ 26. The Agency was unable to locate any records "indicating that any CFPB employee ever recommended or determined that Ms. Steele fell into Quartile 3 for purposes of determining her hiring salary." Mostaghim Decl. ¶ 27; see also Bacon Decl. ¶ 6. Moreover, the notations on the rest of the pay-setting form—including the individual quartile scores, the overall quartile score, and the notation

next to Steele's base salary—all suggest that she fell within Quartile 2, not Quartile 3.  See Pl.'s

Opp'n, Ex. 4 at 394.  By contrast, Steele presents no evidence that the Agency's explanation for

the "Q3" statement was "unworthy of credence."  Dudley v. WMATA, 924 F. Supp. 2d 141, 160

(D.D.C. 2013) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

And even if the statement was not a typo, nothing in the record suggests that the compensation

team set her base salary within Quartile 2 instead of Quartile 3 because of her race or sex.  Thus,

there is no genuine dispute as to whether the Agency "modified" Steele's overall quartile score

in violation of Title VII.

### c.  Comparing Steele's Base Salary to Other CN-40 Examiners

Steele also attempts to discredit the Agency's explanation for her base salary by

identifying other employees who were treated more favorably during the Agency's pay-setting

process.  Specifically, she alleges that two white men—Dumansky and Defeo—were similarly

situated candidates for the CN-40 Examiner position, but they were offered a higher base salary.

"A plaintiff can establish pretext masking a discriminatory motive by presenting

'evidence suggesting that the employer treated other employees of a different race [or sex] more

favorably in the same factual circumstances.'"  Burley v. Nat'l Passenger Rail Corp., 801 F.3d

290, 301 (D.C. Cir. 2015) (quoting Brady, 520 F.3d at 495).  But to rely on "comparator"

evidence, a plaintiff must "demonstrate that all of the relevant aspects of her employment

situation were 'nearly identical' to those of the [white] male" employees.  Neuren v. Adduci,

Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (citation omitted); see also

Brady, 520 F.3d at 495 (noting that employees are similarly situated if they share "the same

factual circumstances"); Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999).  While this issue

"ordinarily presents a question of fact for the jury," the Court may grant summary judgment if no

reasonable juror could find that the plaintiff and the comparators were similarly situated.  George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005) (citation omitted); see also Burton v. District of Columbia, 153 F. Supp. 3d 13, 67 (D.D.C. 2015).

Steele has not provided sufficient evidence that her credentials and prior experience were "nearly identical" to Dumansky's and Defeo's.  Dumansky had over eight years of cumulative experience as both a senior loan originator for two mortgage companies and an underwriter for an insurance company.  Mostaghim Decl., Ex. 6.  The compensation team concluded that these positions were Directly Related Experience because they "mirrored the duties and required skills of a CN-40 Examiner," including "ensuring a financial institution's compliance with relevant consumer protection law."  Mostaghim Decl. ¶ 35.  Defeo had even more Directly Related Experience, as he worked as a loan originator and executive at multiple mortgage companies for more than 16 years.  See id. ¶ 46; id., Ex. 8.  Defeo's prior employment similarly required him to ensure that financial institutions complied with relevant consumer protection laws.  By contrast, Steele had less than two years of experience as a "Business Banker," which involved similar responsibilities and skills.[9]  See Mostaghim Decl. ¶ 21; Pl.'s Opp'n, Ex. 5 at 411–24.  In short, the comparators had more Directly Related Experience, which justified an increase in their overall quartile score and base salary.  Steele does not raise a genuine dispute as to whether this "nondiscriminatory explanation[] of her pay rate [is] pretextual."  Hinds v. Mulvaney, 296 F. Supp. 3d 220, 237 (D.D.C. 2018), aff'd, No. 18-5056, 2019 WL 5432064 (D.C. Cir. Mar. 28, 2019).

---

[9] As explained above, there is no basis for the Court to second-guess the Agency's determination that her employment as an Economist was not Directly Related Experience.

       d.  <u>Comparing Steele's Salary Negotiation to Another CN-40 Examiner</u>

Steele's final argument for why the Agency discriminated against her when setting her initial base salary relates to her unsuccessful negotiations for a higher salary. She contends that while the CFPB rejected her request for a base salary commensurate with her prior employment, the Agency entertained and ultimately granted a similar request by Jackson, a Black man. But here again, Steele has not pointed to a sufficiently similar comparator.

When Steele received her initial salary offer of $64,823, she asked the Agency to raise her base salary to between $76,378 and $84,017. Pl.'s Opp'n, Ex. 5 at 33. This salary range, she explained, was equivalent to the GS-12 level she had reached as an economist. Id. Steele's request was forwarded to the assistant regional director for the Northeast region. Strittmatter Decl. ¶ 4; id., Ex. 1. Because Steele's base salary offer was "about as high as any other grade 40," the assistant regional director declined to support a higher salary. Strittmatter Decl., Ex. 1; id., Ex 2.

Similarly, Jackson asked the CFPB to increase his initial salary offer from $59,292 to $75,080 to match his then-current salary on the GS pay scale. See Mostaghim Decl. ¶ 57; Bacon Decl., Ex. 2. But since Jackson was offered a position as a CN-40 Examiner in the Midwest region, his request was forwarded to a different assistant regional director. See Mostaghim Decl. ¶ 55; Bacon Decl., Ex. 2. That assistant regional director supported Jackson's request because, among other reasons, he obtained "relevant examination skills" as an EEOC investigator that were "needed in the Midwest Region." Bacon Decl., Ex. 2. The compensation team then "redetermined" Jackson's overall quartile score in light of those comments. Mostaghim Decl. ¶ 58; id., Ex. 12 (citing Jackson's "previous experience" and the "critical hiring need of the division" as justifications for the revised quartile score). Critically, the compensation team

increased his Directly Related Experience from Quartile 1 to Quartile 3 "based in part" on the Midwest assistant regional director's assessment that Jackson's investigative experience "mirrored the duties and required skills of a CN-40 Examiner."  Mostaghim Decl. ¶ 59.

According to Steele, this "preferential treatment" demonstrates that the Agency engaged in sex discrimination.  But there are several "confounding variables" that make Jackson's successful negotiation a poor comparator to Steele's failed negotiation.  Burton, 153 F. Supp. 3d at 67 (citation omitted) (listing "differing . . . decision-making personnel" as a confounding variable).  First and foremost, the Agency forwarded Steele and Jackson's salary requests to different assistant regional managers.  See Strittmatter Decl., Ex. 1; Bacon Decl., Ex. 2.  The assistant regional managers then independently commented on whether a higher salary was warranted:  The Midwest manager supported Jackson's request because his examination skills were "needed" in that region, but the Northeast manager did cite an equivalent need in her region.[10]  Bacon Decl. Ex. 2; id., Ex. 3.  The compensation team then adjusted Jackon's salary "in light of" the Midwest manager's comments.  Mostaghim Decl. ¶ 58.  In short, no reasonable jury could conclude that "all of the relevant aspects of [Steele's salary negotiation] were nearly identical to those of [Jackson's negotiation], or that it is possible to draw a 'fair comparison' between their circumstances."  Coats v. DeVos, 232 F. Supp. 3d 81, 95 (D.D.C. 2017) (citations omitted) (granting summary judgment for an age discrimination claim because the plaintiff's comparators were not similarly situated).

* * *

---

[10] Notably, the assistant regional director for the Northeast region declined to negotiate Dumansky's salary too, as his "supporting documentation did not support an increase."  Sutorus Decl., Ex. 1.  She also supported salary redeterminations for multiple female candidates who negotiated for a higher salary.  Bacon Decl. ¶ 15; id., Ex. 4.

Steele failed to carry her burden of demonstrating that the Agency's proffered reason for calculating her overall quartile score at 2.5 and setting her initial salary at $64,823 "was not the true reason for the employment decision." Burdine, 450 U.S. at 256. Accordingly, her Title VII claims based on her initial salary determination cannot survive summary judgment.

### 2. Steele's Salary After the 2023 Salary Reset

Steele's complaint focuses primarily on her initial salary determination, but she asserts in passing that "the gap between [her] compensation and her [white male] counterpart[s'] compensations has continued to increase from the time of her initial employment through the present." FAC ¶ 25. She later clarifies that the Agency's recent "Salary Reset" did not correct for the CFPB's alleged discrimination when it set her initial salary in 2015. Pl.'s Opp'n at 23.

The CFPB implemented a "Salary Reset" in 2023 as part of its efforts to "reform the manner in which the CFPB determined the salary of its employees." Declaration of Daniel Shen ("Shen Decl.") ¶ 3. The Agency "reevaluated the work experience" of its then-current employees—including Steele—to determine their salary under the new pay-setting system. Id.; see also id., Ex. 1. An employee's new compensation was "not affected in any way by the salaries they had received under the prior pay-setting system or the manner in which their work experience had been credited under the prior pay-setting system." Shen Decl. ¶ 5; see also Mostaghim Decl. ¶ 73; Declaration of John Lolley ("Lolley Decl.") ¶¶ 5–6; Declaration of Vickki G Johnson ¶ 6. As a result of the 2023 Salary Reset, Steele received a higher salary. See Shen Decl. ¶ 7; id., Ex. 3.

Steele contends that her revised salary in 2023 would have been even higher if the Agency had properly set her initial salary in 2015. But this barebones assertion falls short for two reasons. First, as discussed above, it is not the Court's place to recalculate her overall

quartile score.  See Wheeler, 812 F.3d at 1114; Fischbach, 86 F.3d at 1183.  Second, even if the

Agency did err when setting her initial base salary, Steele has not identified any evidence—

beyond her own speculation—showing that the error would have affected her compensation after

the 2023 Salary Reset.[11]  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Although,

as a rule, statements made by the party opposing a motion for summary judgment must be

accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to

come within an exception to that rule."); Anderson, 477 U.S. at 252 (noting that the non-moving

party must identify more than the "mere existence of a scintilla of evidence" supporting its

position).  She also failed to rebut the Agency's evidence that her initial salary played no role in

the Salary Reset.  See, e.g., Shen Decl. ¶ 7 (CFPB Compensation Director stating that Steele's

compensation after the Salary Reset was "not affected in any way by the salary she received

prior to the Salary Reset or the manner in which her compensation had been determined at any

time under the pay-setting system that preceded the Salary Reset"); Lolley Decl. ¶ 6 (member of

the salary adjustment committee declaring that he was "not provided information about the

current or former salaries of any individual for whom [he] was crediting work experience as part

of the Salary Reset").  Thus, any Title VII claim she may have based on her post-Salary Reset

compensation also cannot survive summary judgment.[12]

---

[11] Steele's only citation for this claim is her own conclusory response to the Agency's interrogatories.  See Pl.'s Opp'n, Ex. 9 at 6–8.

[12] In a single sentence of her amended complaint, Steele alleges that she was "denied promotions commensurate with her experience."  FAC ¶ 24.  In subsequent briefing, she explains that while Dumansky and Defeo were promoted to the CN-53 pay band through the Agency's "discretionary promotion process," she "remains a CN-51 despite excellent performance feedback reviews."  Pl.'s Opp'n at 23.  This denial-of-promotion claim is barred, however, because Steele failed to raise it in her EEOC complaint before bringing suit.  See 42 U.S.C. § 2000e-16(c); Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) ("A Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" (citation omitted)).  In her

B. Equal Pay Act

In addition to her race and sex discrimination claims under Title VII, Steele brings a sex discrimination claim under the Equal Pay Act. See FAC ¶¶ 64–79. But like her Title VII claims, the Agency has offered a legitimate, non-discriminatory explanation for why her initial base salary was lower than her male colleagues.

Congress passed the Equal Pay Act as a response to the "'ancient but outmoded belief' that a man should be paid more than a woman for performing the same duties." Perez v. D.C. Dep't of Emp. Servs., 305 F. Supp. 3d 51, 56 (D.D.C. 2018) (Cooper, J.) (citation omitted). The law prohibits employers from paying an employee of one sex a lower wage than it pays an employee of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). To establish an Equal Pay Act violation, a plaintiff must first show that the employer paid disparate wages for equal work. Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO, 815 F.2d 1519, 1523 (D.C. Cir. 1987). "Once a prima facie case has been made out, the defendant may rebut the showing of [job] equality, or assert one of the Act's [four] affirmative defenses." Id. These defenses allow wage disparities "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

---

amended complaint, Steele identifies only one EEOC complaint, see FAC ¶¶ 7–9, and her denial-of-promotion claim was "not part" of that complaint, Sohn Decl., Ex. 16 at 8; see also id., Ex. 10; id., Ex. 15 at 2. Steele conceded as much in her deposition, see id., Ex. 3 at 218, and she does not argue otherwise in her summary judgment briefing. Because there does not appear to be a genuine dispute as to whether she administratively exhausted her denial-of-promotion claim, it too cannot survive summary judgment. See Proctor v. District of Columbia, 74 F. Supp. 3d 436, 454–57 (D.D.C. 2014).

The Agency submits that Steele's initial base salary was based on a "factor other than sex": her prior work experience.  See Def.'s Mot. at 29.  As described above, there is considerable evidence in the record showing that Steele's base salary was set by her overall quartile score, which in turn reflects her Directly Related Experience, Overall Professional Experience, and Candidate Skill Set.  See, e.g., Bacon Decl., Ex. 1; Mostaghim Decl. ¶¶ 20–24; id., Ex. 1; id., Ex. 2 at 264–65.  And again, Steele has offered no evidence that the Agency did not apply its pay-setting tool "in good faith" or otherwise used her overall quartile score "as a pretext to pay [men] more than her or other women employees performing the same job." Johnson, 2022 WL 4547527, at *5.  Because there is no genuine dispute as to whether Steele's initial base salary was set based on a "factor other than sex," the Agency is entitled to summary judgment on her Equal Pay Act claim too.  See id. at *5–6; Gaujacq v. EDF, Inc., 601 F.3d 565, 575–76 (D.C. Cir. 2010) (affirming a district court's grant of summary judgment when the undisputed record presents "no doubt" that a pay disparity was "based on factors other than sex"); Savignac v. Day, 754 F. Supp. 3d 135, 174 (D.D.C. 2024) (granting summary judgment when defendants proffered evidence "not subject to reasonable dispute" that a pay disparity was based on the employees' experience, training, or ability).

## IV.  Conclusion

For the foregoing reasons, the Court will grant the Agency's Motion for Summary Judgment.  A separate Order shall accompany this memorandum opinion.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>December 19, 2025</u>